## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES

v.                                                      No. 3:09cr51 (SRU)

HOPETON WIGGAN

### RULING ON MOTIONS TO SUPPRESS

On the morning of October 25, 2008, Hopeton Wiggan was stopped and arrested by local police in New Haven, Connecticut. A search incident to that seizure revealed a loaded Colt .45 pistol, a large quantity of marijuana, and more than $1,300 in cash on Wiggan's person. Subsequently, the government indicted Wiggan for unlawful possession of a firearm and drugs. Wiggan moved to suppress the government's evidence against him. A suppression hearing was held on January 22, 2010 and continued on January 26, 2010. The parties thereafter submitted post-hearing briefing, and oral argument was held on June 18, 2010.

Based on my findings of fact, set forth below, Wiggan's Fourth Amendment rights were not violated when he was seized and ultimately arrested. The officers' initial approach to Wiggan did not constitute a Fourth Amendment seizure, and when the officers seized Wiggan, they had reasonable suspicion to support an investigatory stop-and-frisk. Wiggan is therefore not entitled to the suppression of the government's evidence and his motion is denied.

### I.    Findings of Fact

At 8:40 a.m. on Saturday, October 25, 2008, a dispatcher at the New Haven Police Department ("NHPD") radioed an anonymous tip that a black man named "Hope" was carrying a

gun in his pocket.[1]  The dispatcher relayed to patrol officers that the anonymous caller described

"Hope" as wearing a blue sweater, blue jeans with a design on the back pocket, and a blue

hooded sweatshirt, and that he had entered a barbershop at the corner of Lombard and Rowe

Streets in the Fair Haven neighborhood of New Haven.  The dispatcher also said that the

anonymous caller left no call-back number.  (Ex. 2A.)

Detective Carlos Roman responded to the call and drove to the corner of Lombard and

Rowe, where he saw Moe Love's Barbershop on Rowe Street.  Officer Diego Quintero arrived

shortly thereafter.  At 8:43 a.m., Roman radioed the dispatcher to confirm the person's

description; Roman could not recall whether he called from his car or from his portable radio, but

Roman testified that he radioed before approaching the front door of the barbershop.  (Tr. 37.)

The dispatcher replied that the person was a black male; was wearing a sweater, a hooded

sweatshirt, and jeans with print on the back; and was known as Hope.  (Ex. 4A.)

After receiving the suspect's description, Roman and Quintero walked up to the front

door of Moe Love's barbershop and entered it together, with Roman leading and Quintero

following.  Roman surveyed the store.  The barbershop was narrow, perhaps seven to ten feet in

width.  Along the left wall were four cutting stations; a barber named Kim Graham[2] was cutting a

---

[1] The government's brief describes the anonymous informant as giving more information to the NHPD.  The informant's full complaint included that he/she knew "Hope" from the neighborhood, that he/she had seen the gun, and that "Hope" had threatened reprisal if he/she called the police.  Those facts, however, are irrelevant for the purposes of the motion to suppress because the dispatcher's knowledge may not be imputed to the arresting officers.  *See United States v. Colon*, 250 F.3d 130 (2d Cir. 2001) (holding that collective knowledge doctrine does not apply to information learned by police dispatchers that is not relayed to law enforcement officers).

[2] The testimony left some uncertainty about Kim's last name – witnesses said it was "Graham" or "Moore."  Although perhaps not accurate, I refer to her as Graham for the sake of

boy's hair in the chair closest to the door, while Rodney Tucker, another barber, was cutting a customer's hair two chairs down. Graham and Tucker were standing and their customers were sitting on chairs pulled away from the left wall. On the right side of the shop were chairs for waiting customers; there was approximately two to three feet of space between those waiting chairs and Graham and Tucker's barber chairs. (Tr. 303.) Near the front door sat George Blackwell, whose son was receiving a haircut from Graham. Farther down, just beyond Tucker's work station, sat Hopeton Wiggan. He wore a baggy pair of jeans and a large blue hooded sweatshirt. Roman also testified that, in addition to the people sitting on both sides of the narrow room, the barbershop was cluttered with furniture and debris.

Upon entering Moe Love's, Officer Roman asked in a commanding tone of voice whether anyone there was named "Hope." Tucker and Blackwell turned their heads to look at the officers. Wiggan, who had been slouching, jerked his body up, raised his hand, and identified himself as Hope. Roman and Quintero then began to walk over to Wiggan's seat, with Quintero trailing Roman closely. Blackwell turned to look back at his son and remembers seeing Graham continuing to cut his son's hair. Tucker also returned his attention to his customer as Roman and Quintero approached Wiggan.

What happened next is disputed and essential to Wiggan's motion. According to Roman, he and Quintero walked towards Wiggan until they stood approximately two feet away from him, close enough that Wiggan would have bumped into Roman had he tried to leave the store. (Tr. 165.) Roman testified that he walked quickly because he did not want to delay removing Wiggan from the shop (Tr. 167); he also said that he did not have his hand on his service weapon (Tr.

consistency.

152).  According to Roman, Wiggan appeared suspicious: he changed his position dramatically when the police entered the store, glanced behind him at a back doorway leading out of the barbershop as the officers approached, and only reluctantly answered that he was Hope.  (Tr. 47-49.)  After reaching Wiggan, Roman claims that he asked Wiggan to step outside in a calm, normal voice.  As he recalled, his exact wording was "Sir, can you step outside with me, please?"  (Tr. 52.)  At this point, Wiggan began to stand up.  As he rose from his seat, Roman testified that the officers observed a brown pistol grip sticking out of his right pants pocket.[3]  Roman then said, "75! 75!," the police department's code for a handgun.  (Tr. 55-56.)  Roman took Wiggan by his right arm, and Quintero by his left.  The officers pulled Wiggan's wrists behind his back and placed them in handcuffs, and proceeded to lead Wiggan outside.

---

[3] Wiggan argues that the Roman was incapable of seeing the gun in Wiggan's pants pocket because the pocket was spacious enough to have covered the whole gun.  Furthermore, Wiggan claims that his baggy sweatshirt would have obstructed the officers' view of the top of his pants.  Although I acknowledge that Wiggan's clothing was loose and oversize, Roman's account of seeing the gun as Wiggan arose is not implausible.  Indeed, it is entirely possible that Wiggan's gun was not fully enclosed by his pocket; that his pants were worn below his waist so that his pants pocket was further down his leg and away from the hem of his sweatshirt; and that his sweatshirt was bunched and did not extend to his pants pocket.  The simple fact that Wiggan's clothing was baggy does not make Roman's account unbelievable.

On the other hand, I do not credit Sergeant Zona's corroborating testimony about the location of Wiggan's gun on his person.  At approximately 8:45 a.m., Sergeant Zona arrived at the corner of Lombard and Rowe Streets.  He testified that he saw Roman and Quintero escorting Wiggan out of the barbershop and observed them search Wiggan.  Zona claims that when he arrived at Moe Love's, he observed a brown pistol grip protruding from Wiggan's pants pocket.  (Tr. 211.)  Zona's recollection, however, may have been affected by his reading of Roman's incident report in preparation for this hearing.  As the defense demonstrated, Zona never wrote a contemporaneous report about the arrest and did not remember seeing the butt of Wiggan's gun when he first met with federal prosecutors in June 2009.  (Tr. 211, 219.)  Zona read Roman's incident report before the hearing, however, and only first recalled seeing the brown grip at a second meeting with federal prosecutors in January 2010.  Although Zona undoubtedly saw the gun at some point on the morning of October 25, 2008 – he radioed that the officers retrieved the firearm and narcotics after arriving at Moe Love's (ex. 14A) – it is unlikely that he saw the weapon sticking out of Wiggan's pocket when he arrived on the scene.

George Blackwell and Rodney Tucker had quite different accounts of what happened at 8:44 a.m. in Moe Love's barbershop.[4]  Blackwell said that Roman and Quintero opened the door to Moe Love's and asked "Who's Hope?," but walked quickly towards Wiggan as if they knew who he was.  Blackwell testified that Roman walked right by him with his hand on his service weapon and that, once in front of Wiggan, Roman said in a loud voice "stand up, you're under arrest." (Tr. 253, 260, 286.)  Blackwell also recalled the officers ordering Wiggan to get his hands out of his pockets.  (Tr. 255.)  Similarly, Tucker testified that Roman and Quintero walked up to Wiggan and said, "Get your hand out of your pocket.  Stand up, turn around.  You're under arrest."  (Tr. 305.)  Tucker said that Roman spoke in a firm, raised voice.  (Tr. 307.)  After ordering Wiggan to stand up, the officers handcuffed him and took him outside.  (Tr. 306.)  Tucker said that he was standing two to three feet away from Wiggan when the handcuffing occurred.  (Tr. 306.)  Neither Blackwell nor Tucker remember hearing Roman ask Wiggan to step outside (Tr. 255, 305-6) or seeing anything in Wiggan's right pants pocket (Tr. 289, 306).

Roman, Blackwell, and Tucker are all credible witnesses, and the testimony of each is entitled to respect.  Roman is a longstanding member of the New Haven Police Department who has received numerous awards and has a minimal disciplinary record; Blackwell is a former marine, a married father of two children, and has consistently been employed, sometimes working multiple jobs to support his family; and Tucker has been regularly employed, serving, in addition to his barbershop shifts, as a counselor for adults with special needs.  The evidence is

---

[4]  Wiggan also testified at trial.  His testimony, however, was mostly limited to identifying the clothing he wore on the date of his arrest, demonstrating how those clothes hung off of him, and describing how he was physically subdued during the seizure.  Wiggan offered no testimony about what Roman and Quintero said to him, how they entered the barbershop, or other aspects of their conduct while arresting him.

clear that all three men are upstanding members of their communities.  Although Wiggan has challenged Roman's credibility, and the government has argued that Blackwell and Tucker were inclined to give testimony in Wiggan's favor, I am loath to attribute bias to any of them or credit one witness's testimony as being inherently more believable than another's.

Wiggan also claims that Blackwell and Tucker are more credible because their version of events – that the officers immediately arrested Wiggan upon entering the barbershop – is more consistent with the timing of Wiggan's seizure.  Wiggan is correct that the events in Moe Love's happened quickly.  At 8:44:35 a.m., 28 seconds after Roman contacted the police department outside Moe Love's for a description of the suspect, Sergeant Anthony Zona radioed Quintero to see whether he had arrived at Lombard and Rowe.  Quintero and Roman were still in the barbershop but had placed Wiggan in handcuffs.  Quintero replied, "We have him secured.  We have him secure for now.  We're going to take him out."[5]  That communication lasted 16

---

[5]  On its face, Officer Quintero's statement appears to bolster Wiggan's claim that the officers never asked him to step outside or saw the butt of his firearm, but handcuffed him entirely on the basis of the anonymous complaint.  Quintero did not mention that a weapon was observed and his phrasing implies that the officers had entered Moe Love's with the purpose of removing Wiggan and not to investigate the report of weapon possession.  That suggests that Quintero and Roman believed they had reasonable suspicion to seize Wiggan on the sole basis of the anonymous complaint, which discredits Roman's account that he asked Wiggan to step outside and that Wiggan's weapon was exposed when he stood up.

It is difficult to read much into the content of Quintero's transmission, however, because there was little testimony about why Quintero said what he said.  Quintero was not called by either the government or Wiggan, and Roman could not offer a reason for why Quintero did not mention their observation of a weapon in his transmission.  (Tr. 170-71.)  And Quintero's statement can also be interpreted more favorably for the government.  Quintero's declaration that he and Roman had secured Wiggan may have simply been an update to other arriving officers that the situation was under control.  (Tr. 169.)  Understood that way, Quintero's statement does not imply that he entered Moe Love's believing he already had reasonable suspicion to seize Wiggan.  Rather, his transmission was intended to convey that he and Roman had fully responded to the call, there was no emergency, and backup was unnecessary.

seconds; police department phone logs record that communication ending at 8:44:51 a.m.  (Ex. 7A.)  Thirty seconds later, at 8:45:21 a.m., after he and Quintero had taken Wiggan out of the barbershop, Roman radioed to NHPD that he had searched Wiggan and found the firearm.  (Ex. 13A.)  In total, at least 46 seconds – from the beginning of Quintero's communication with Zona until Roman's transmission outside Moe Love's – elapsed between the handcuffing in the barbershop and the pat-down outside, as compared to the 28 seconds it took for the officers to walk up to and enter the barbershop, and then identify and handcuff Wiggan.  But while 28 seconds is a relatively short period of time, it is not so quick that it renders Roman's account implausible, especially when one considers the small distance the officers had to cover in the barbershop and the officers' admitted interest in conducting their investigation efficiently.  I therefore do not find that the timing of Wiggan's seizure makes the defense witnesses' testimony more credible that the government witnesses' recollections.

Despite the fact that their recollections of the events of October 25, 2008 diverge, Roman's, Blackwell's, and Tucker's testimony can be fairly harmonized as follows.  When Officers Roman and Quintero entered Moe Love's barbershop, Roman asked "Who's Hope?"  Wiggan responded by raising his hand and identifying himself.  He shifted his body and looked briefly over his right shoulder.  Roman and Quintero walked briskly and purposefully past Blackwell and Tucker, covering a distance of no more than 25 feet, until they stopped immediately in front of Wiggan.  While he walked, Roman had his hand close to or on his service weapon.  As the officers neared Wiggan, Blackwell turned to his son in order to make sure he was secure, and Tucker looked at his customer, perhaps out of respect or even embarrassment for Wiggan while he was being confronted by police.  Roman then asked Wiggan

to step outside for questioning.  As Wiggan began to rise, Roman saw the brown pistol grip

sticking out of Wiggan's right front pants pocket.  At that point, Roman yelled "75!" and then

loudly ordered Wiggan to stand and keep his hands away from his pockets.  Roman proclaimed

that Wiggan was under arrest, and he and Quintero handcuffed Wiggan.  Blackwell and Tucker

then looked back to see Wiggan handcuffed and being taken out, and Officer Quintero responded

to Sergeant Zona's transmission, informing him that Wiggan had been secured.  Roman's initial

questioning and the officers' eventual handcuffing of Wiggan happened fast – literally, in a

matter of seconds – and were quick enough for witnesses to miss material details if they were

turned away.[6]

The ensuing events were uncontested.  As the officers led Wiggan out of the barbershop,

Quintero asked him whether he had "anything" on his person.  Wiggan responded, "I have a

gun," and then said "I'm hit, I'm hit."  (Tr. 63-64.)  Outside of Moe Love's, Roman and Quintero

searched Wiggan's front right pants pocket and retrieved a loaded Colt .45 caliber pistol.  (Tr.

66.)  Roman radioed NHPD that the gun was secure.  He then asked Wiggan whether he had a

permit for the weapon; Wiggan admitted that he did not.  (Tr. 67-68.)  The officers placed

Wiggan under arrest for possession of a concealed weapon without a permit and searched

Wiggan's person.  That search incident to arrest yielded a large plastic bag of marijuana, a scale,

and $1,348 in cash.

On February 25, 2009, the government indicted Wiggan on two counts: possession of a

_____

[6] It is because of the speed with which the events unfolded that I do not credit Blackwell's
testimony that Roman ordered Wiggan to get his hands out of his pockets while the officers
approached Wiggan.  (Tr. 263.)  Blackwell admitted to turning his head away while the officers
proceeded down Moe Love's aisle (Tr. 277), and therefore was not in the best position to observe
where Roman was when he uttered his commands to Wiggan.

firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2), and possession

of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(D).

Wiggan then filed two motions to suppress.  He first moves for suppression of physical evidence

– namely, the retrieved firearm, drugs, and scale – because he was seized in violation of the

Fourth Amendment.  Wiggan also moves for suppression of the statements he made to the

officers during his seizure because they were purportedly obtained in violation of his Fifth

Amendment privilege against self-incrimination.  The government opposes both motions but

presented evidence only with respect to the unreasonableness of the seizure, arguing that if the

physical evidence were held to be admissible then the question whether to exclude Wiggan's

incriminatory statements would be moot.

## II.    Discussion

"In a motion to suppress physical evidence, the burden of proof is initially on the

defendant.  Once the defendant has established some factual basis for the motion, the burden

shifts to the government to show that the search was lawful."  *United States v. Breckenridge*, 400

F. Supp. 2d 434, 437 (D. Conn. 2005) (citations omitted).  Ultimately, the burden is on the

government to prove by a preponderance of the evidence that Wiggan's seizure was not in

violation of the Fourth Amendment.  *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y.

211), *aff'd*, 201 F.3d 116 (2d Cir. 2000).

Wiggan raises several arguments in support of his contention that he was seized illegally.

First, he asserts that the seizure occurred before he was handcuffed and physically restrained.  In

Wiggan's view, he was seized when the officers first approached him at his seat, a point in time

when the officers lacked reasonable suspicion.  Next, Wiggan argues that, when he was

handcuffed, he was arrested without probable cause and not merely subjected to a limited

investigative stop.  Finally, he claims that, if his detention was a mere investigative stop and not

an arrest, the seizure was illegal because Officers Roman and Quintero lacked reasonable

suspicion.  I consider each issue in that order.

     A.      <u>When did the seizure occur?</u>

The Fourth Amendment provides that "[t]he right of the people to be secure in their

persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants

shall issue, but upon probable cause."  U.S. Const. amend. IV.  Not every interaction between a

police officer and a civilian constitutes a "seizure" within the Fourth Amendment's terms.

Rather, a seizure occurs only when a reasonable person, standing in the same position as the

allegedly seized individual, would not feel free to leave or to refuse to cooperate with the police

officer.  As the Supreme Court has held:

> Law enforcement officers do not violate the Fourth Amendment's prohibition
> of unreasonable seizures merely by approaching individuals on the street or in
> other public places and putting questions to them if they are willing to listen. .
> . . Even when law enforcement officers have no basis for suspecting a
> particular individual, they may pose questions, ask for identification, and
> request consent to search . . . provided they do not induce cooperation by
> coercive means. . . . If a reasonable person would feel free to terminate the
> encounter, then he or she has not been seized.

*United States v. Drayton*, 536 U.S. 194, 200-01 (2002) (citations omitted).  That reasonable

person standard is objective and "presupposes an innocent person."  *Florida v. Bostick*, 501 U.S.

429, 438 (1991).

In determining whether a seizure has occurred, the Court has eschewed per se rules for

fact-specific examinations.  "[T]he crucial test is whether, taking into account all of the

circumstances surrounding the encounter, the police would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)); *see also Drayton*, 536 U.S. at 201 ("*Bostick* first made it clear that for the most part *per se* rules are inappropriate in the Fourth Amendment context."); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.) ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). Factors that can turn a consensual exchange of information between a police officer and civilian into a Fourth Amendment seizure include the following:

> [T]he threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*United States v. Hooper*, 935 F.2d 484, 491 (2d Cir. 1991) (quotation omitted).

It is undisputed that Wiggan was seized when he was handcuffed. Wiggan claims, however, that he was initially seized when Roman and Quintero approached and questioned him in the barbershop because, given the officers' conduct and tone, no reasonable person would have felt free to terminate the encounter. Wiggan emphasizes the small distance between the officers and him; that the officers essentially blocked his exit because of their positioning and the narrow dimensions of the barbershop; Roman and Quintero's uniformed and armed presence; that Roman had his hand on or near his holstered service weapon; and that the officers approached

-11-

him speedily and purposefully.  Under those circumstances, Wiggan asserts, no reasonable

person would have felt free to leave or to decline Officer Roman's request to speak outside.[7]

Whether a seizure occurred at that instant is a close question.  The government cites

*Drayton*, which involved police questioning of travelers within the cramped confines of a

commuter bus.  There, the Supreme Court held that no seizure had occurred because, even if a

reasonable person would not have felt free to exit the bus, a reasonable person would have felt

free to decline to answer the officers' questions or submit her effects to a search.  Other factors

such as the closed space between the officers and the passengers, the officers' uniformed and

armed presence, the inaccessibility and impracticality of exiting the bus, and the officers' failure

to notify the passengers of their rights to refuse questioning were all considered; none was found

in isolation or conjunction to amount to a Fourth Amendment seizure.  *Drayton*, 536 U.S. at 203-

05; *see also Bostick*, 501 U.S. at 435-37 (holding that small space and inaccessibility of the exit

did not inherently render police questioning on a bus a Fourth Amendment seizure).  On the other

hand, Wiggan cites cases where facts similar to his own have been found to constitute a seizure.

In *United States v. Person*, 134 F. Supp. 2d 517, 521 (E.D.N.Y. 2001), a case decided before

*Drayton*, police officers requested a suspect seated in a restaurant "to do them 'a favor' and put

[his food] down, stand, and raise his hands."  That conduct was held to be a seizure because

"[r]egardless of how 'politely' [the officers] asked, no reasonable person would believe he was

---

[7] Wiggan also alleges that the officer's order that Wiggan stand up, turn around, and take
his hands away from his pockets were coercive.  I would agree.  But, as a matter of factual
finding, I have determined that Roman's commands to Wiggan occurred *after* Roman asked
Wiggan to step outside and saw the gun in Wiggan's pants pocket.  Roman issued that command,
in other words, in the course of physically restraining Wiggan.  Roman's statements are therefore
not relevant to the question whether a seizure occurred before Wiggan was handcuffed.

free to leave in such a situation." *Id.* at 523 n.1.  In other words, the officers' question was, in fact, an order that no reasonable person would ignore.  *See also United States v. Riley*, 351 F.3d 1265, 1267 (D.C. Cir. 2003) (holding that officers' ordering of motorist to stop and dismount his vehicle, and then surrounding the motorist so that he "couldn't have moved without actually making contact with one or the other" officer, was restrictive enough for a reasonable person to conclude that he or she was not free to terminate the encounter).

The closeness of the space between Wiggan and the officers, as well as the officers' positioning to cut off Wiggan's access to the barbershop's front exit, are not dispositive of whether Wiggan was stopped under the Fourth Amendment.  In *Drayton* and in *Bostick*, the Court held that the proximity between the officers and an individual is not, in itself, determinative of the voluntariness of the encounter.  *See Drayton*, 536 U.S. at 204 ("The fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure."); *Bostick*, 501 U.S. at 437 (holding that "[w]here the encounter takes places is one factor, but is not the only one" pertinent to the Fourth Amendment analysis).  Rather, in addition to the close spacing, other factors – specifically, circumstances indicating that the officers used physical force or otherwise demonstrated their authority – must be present to conclude that the police acted coercively and the person was detained.  *Hooper*, 935 F.2d at 491.

The fact that the officers were uniformed and armed does not establish the kind of coerciveness necessary to establish a seizure.  *See Drayton*, 536 U.S. at 204-05 (noting, in dicta, that "[o]fficers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort," and "[m]uch the same can be said for wearing sidearms"); *United States v. Smith*, 423 F.3d 25, 30 (1st Cir. 2005) (holding that stop did not occur when armed and

-13-

uniformed officers approached person on either side and questioned him).  Nor does the fact that

Roman and Quintero walked quickly and purposefully towards Wiggan establish a demonstration

of authority that would have forced a reasonable person to submit to them.  *See United States v.*

*Goddard*, 491 F.3d 457, 461-62 (D.C. Cir. 2007) (holding that stop did not occur when

uniformed and armed officers "jumped out" of their cars and walked quickly, but did not run

aggressively, toward the defendant).  Rather, the best fact that Wiggan puts forward is Roman's

positioning of his hand on or near his service weapon as he walked in the barbershop.

Just as it is clear that the presence of an officer's holstered weapon does not establish a

seizure, there is also no doubt that an officer's display of a weapon – that is, an officer's removal

of his firearm and aiming in a person's direction – is a show of authority that immediately turns a

consensual encounter into a coercive detention.  *Compare Drayton*, 536 U.S. at 204 ("The

presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter

absent active brandishing of the weapon."), *with Mendenhall*, 446 U.S. at 554 (opinion of

Stewart, J.) ("Examples of circumstances that might indicate a seizure . . . would be the . . .

display of a weapon by an officer.").  But an officer's placement of his hand on or near a

holstered service weapon falls somewhere between those two extremes.  The gesture is

ambiguous – it can be taken equally as a meaningless happenstance, as a self-defense measure, or

a demonstrative threat of physical force – and its significance will be determined according to the

context in which is occurs.

Here, the facts indicate that Ramon had his hand close to his weapon as a security

precaution.  There is nothing in the record indicating that Roman made a point of showing his

holstered firearm to Wiggan or that Wiggan even saw where Roman's hands were.  The sole

evidence that Roman kept his hand on his weapon was provided by Blackwell, who testified about the position of Roman's hand but said nothing about whether Roman acted threateningly or made a show of the fact that he could promptly unholster his sidearm. Thus, the record establishes only that Roman's placement of his hand on or near his service weapon was a defensive gesture, and did not effectively restrain Wiggan or force him to cooperate with the police. Other courts have reached the same result on similar facts. *See, e.g.*, *United States v. Baker*, 78 F.3d 1241, 1244 (7th Cir. 1996) (holding that officer's approach toward car with hand on his weapon was reasonable under the circumstances and did not constitute a threat to compel defendant's cooperation); *United States v. Cox*, 752 F.2d 741, 747 (1st Cir. 1985) ("Nor . . . does the fact that the DEA agents may have had their hands on their holsters automatically show that [the defendant's] will was 'overborne.'"); *United States v. Graham*, No. 08-cr-6259L, 2009 WL 4110370, at *7 n.9 (W.D.N.Y. Nov. 23, 2009) (noting, in dicta, that no seizure occurred when officer "unsnapped his holster and placed his hand on his firearm without withdrawing it" in response to defendant's erratic behavior).

Wiggan puts great weight on Roman's testimony that he placed his hand on his holstered weapon and acted generally "to control the situation." (Tr. 151.) But exerting control over a situation does not imply that Roman and Quintero took actions to subdue Wiggan and force him to follow their orders against his will. Roman is better understood as having taken steps to "control the situation" in order to limit the risk of harm to himself and others but without going so far as to seize Wiggan. Indeed, Roman testified that he did not want to rush or otherwise intimidate Wiggan for fear that Wiggan might panic and attempt to flee, struggle with the officers, or reach for a weapon. In short, Roman acted out of concern that a demonstration of

aggression might provoke a dangerous situation for the officers and bystanders, who included a small child.  (Tr. 52-53.)  That is consistent with Roman's account that he wanted Wiggan to leave voluntarily and without physical force, and with my conclusion that Roman held his hand near his service weapon as a self-defense measure.

For those reasons, I conclude that Wiggan was not seized until the officers placed him in handcuffs.  Although Wiggan may not have been comfortable in the small space of the barbershop and under the gaze of armed, uniformed police officers, he was not effectively detained by the police at the initial moment Roman asked him to step outside.  The proper inquiry under the Fourth Amendment is whether a reasonable person would have felt free to decline Roman's request and remain seated.  Based on my findings of fact, a reasonable person would have felt free to refuse cooperation with Roman's entreaty to leave the barbershop. Wiggan, therefore, was not stopped until the officers resorted to using physical restraints against him.

     B.    <u>Was Wiggin arrested when he was handcuffed?</u>

Wiggan next argues that when Detective Roman and Officer Quintero placed him in handcuffs and led him out of the barbershop they arrested him within the meaning of the Fourth Amendment, which required the officers to have probable cause.  The government responds that Wiggan was not arrested until after he was led outside and patted down, and that the officers' use of handcuffs in the barbershop did not elevate the seizure beyond an investigative stop justified by the lower standard of reasonable suspicion.

"Under *Terry v. Ohio*, 392 U.S. 1 (1968), police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him

if they reasonably believe he is armed and dangerous. . . . A *Terry* stop represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007) (citations omitted).  A *Terry* stop, by definition, is a seizure less intrusive than a full arrest.

> The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).

Wiggan argues that the officers' use of handcuffs was more than what was minimally necessary in order to effectuate the legitimate purpose of investigating and preventing a suspected crime.  He contends that, because the officers used more force than was required, what could have been a stop-and-frisk ripened into an arrest that must have been justified by probable cause.  *See Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) ("If the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause." (quotation omitted)).  Wiggan cites to *United States v. Acosta-Colon*, 157 F.3d 9 (1st Cir. 1998), for the proposition that the use of handcuffs in the course of a stop-and-frisk is an unreasonably intrusive form of restraint absent specific facts demonstrating that cuffing was necessary.  *Acosta-Colon* involved the temporary detention of airplane passengers

suspected of carrying drugs; the defendants were stopped and handcuffed before they could board

their aircraft and then held for half an hour despite the absence of evidence demonstrating that

they posed an imminent safety risk to customs officers or the public. *Id.* at 12. The Fist Circuit

noted that the use of handcuffs in a *Terry* stop is exceptional:

> [W]hen the government seeks to prove that an investigatory detention
> involving the use of handcuffs did not exceed the limits of a *Terry* stop, it
> must be able to point to some specific fact or circumstance that could have
> supported a reasonable belief that the use of such restraints was necessary to
> carry out the legitimate purposes of the stop without exposing law
> enforcement officers, the public, or the suspect himself to an undue risk of
> harm.

*Id.* at 18-19. The *Acosta-Colon* Court held that handcuffs were uncalled for in the performance

of a *Terry* stop because, on the facts of that case, there was no evidence that the officers

"harbored an actual suspicion that [the defendant] was armed or otherwise presented an

appreciable danger." *Id.* at 19 (footnotes omitted) (emphasis in original).

Wiggan claims that the facts of his seizure are nearly identical: although the officers

observed that he was holding a firearm, there was no indication that he was likely to use it

against the officers or otherwise likely to use it immediately to commit another crime. Therefore,

the specific facts indicating an "undue risk of harm" were not present and the use of handcuffs

was unnecessary to effectuate the stop-and-frisk.

Wiggan is correct that handcuffing, a hallmark of a custodial arrest, is an unusual step to

take in the course of an investigative stop. But there should be nothing controversial about

police officers using more restraining techniques in the course of performing a *Terry* stop when

there is reasonable suspicion that a suspect is carrying a firearm. *See Oliveira v. Mayer*, 23 F.3d

642, 646 (2d Cir. 1994) ("Indeed, whenever this Court and other circuits have found an intrusive

-18-

detention to be only a *Terry* stop, the police have always had a reasonable basis to believe the suspect was armed or otherwise dangerous.").  In *United States v. Alexander*, 907 F.2d 269, 272-73 (2d Cir. 1990), the Second Circuit upheld the use of highly intrusive and threatening police conduct – namely, pulling over the defendant's car, approaching it with guns drawn, and ordering the driver out – in the course of a roadside investigative stop.  The police officers' basis for resorting to those tactics was adequately supported by the facts that the defendant had been observed engaging in suspicious activity, including returning to his car parked in a known drug area with a brown paper bag in tow, and then driving evasively and dangerously.  *Id.* at 273.  Moreover, when the officers pulled over the defendant, they were in a public place filled with potential innocent bystanders.  *Id.*  The *Alexander* Court held that circumstantial evidence of the defendant's possible illegal activity and safety risk to others justified the officers' use of intrusive restraints and did not elevate their investigative stop into an arrest.  Officers Roman and Quintero, by contrast, used a more limited form of restraint on a much stronger basis of suspected dangerousness.  Although Wiggan's hands were bound, his life was never imperiled by the officers' drawn weapons.  Also, unlike in *Alexander,* where the officers had to infer that the suspect was engaged in illegal and potentially dangerous activity, Roman observed what appeared to be a pistol grip in Wiggan's pants pocket and therefore had a direct evidentiary basis for concluding that Wiggan was engaged in unlawful conduct – i.e., illegal possession of a concealed weapon – and posed an immediate safety risk.

It is important to note, too, that the officers' use of handcuffs was the only fact that would have led Wiggan's seizure to blossom into a Fourth Amendment arrest.  Other factors, such as the small number of officers and the short duration of the stop, militate in favor of concluding

that the officers only performed a stop-and-frisk.  *See United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993) (listing factors that courts have considered in determining whether a *Terry* stop became a de facto arrest).  Roman did announce that Wiggan was "under arrest" while handcuffing Wiggan.  But the subjective belief of the seizing officer does not control the analysis of whether a *Terry* stop occurred.  *United States v. Jackson*, 652 F.2d 244, 250 (2d Cir. 1981).  Here, the objective facts show that Wiggan was seized for a period of less than a minute, enough time to permit the officers to escort Wiggan out of the barbershop, perform a frisk, and discover and remove the gun from his person.

It was only after the stop-and-frisk had revealed the handgun that Wiggan was arrested. *Cf. United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (holding that seizure of a fleeing suspect did not result in an arrest until after officers handcuffed and frisked him, and discovered the defendant's firearm); *United States v. Ramos*, 71 F. Supp. 2d 40, 46-47 (D. Conn. 1999) (holding that brief detention of suspect with handcuffs and with drawn weapons was an investigative stop, and that no arrest occurred until the officers completed the frisk and retrieved the defendant's gun).  The distinction between the initial investigatory stop and eventual custodial arrest is supported by the transcripts of the communications between the officers on the scene and the police department.  Roman radioed a report to the NHPD once Wiggan was removed from the barbershop and his firearm was secured, at which point the *Terry* stop had been completed.  (Ex. 13A.)  Then, seven seconds later, Sergeant Zona, who had just arrived at the barbershop, radioed that the firearm and drugs were recovered.  (Ex. 14A.)  That subsequent transmission indicates that Wiggan had been arrested and had been subject to a full search beyond the preliminary frisk.

-20-

Wiggan was subject to an investigatory stop-and-frisk when he was handcuffed, removed from the barbershop, and patted down.  Although the use of handcuffs is generally uncalled for in performing a *Terry* stop, Officers Roman and Quintero were justified in using them because they had a reasonable basis for believing Wiggan was armed and, therefore, potentially dangerous.  It was only after the gun was retrieved and Wiggan remained in cuffs and was further searched that the seizure became an arrest – an arrest that, following the discovery of Wiggan's weapon, was undoubtedly supported by probable cause.

C.      Did the officers have reasonable suspicion to handcuff Wiggan?

Because no stop was performed until the officers put Wiggan in handcuffs, none of the exchange beforehand implicates the Fourth Amendment.[8]  But Officers Roman and Quintero needed at least reasonable suspicion, based on specific articulable facts, to justify the seizure that occurred when they physically restrained Wiggan.  *Elmore*, 482 F.3d at 178-79.

Wiggan argues that the police had no reasonable suspicion for stopping him because, although their observations confirmed the anonymous tip that he was carrying a weapon, the officers lacked any reasonable suspicion that he was in the midst of or about to commit a crime, or that he was otherwise dangerous.  For, as Wiggan argues, he could have had a firearm permit and been carrying the pistol lawfully.  In support, he cites *United States v. Ubiles*, 224 F.3d 213 (3d Cir. 2000), where the Third Circuit held that a reliable tip that the defendant, who was

---

[8] Wiggan argued at length that no reasonable suspicion existed based exclusively on the anonymous tip to support the officers' purported seizure of Wiggan before they observed his handgun.  *See Florida v. J.L.*, 529 U.S. 266 (2000) (holding that anonymous tip that defendant had a gun and offering nothing other than his physical description and location lacked sufficient indicia of reliability to establish reasonable suspicion).  Those arguments, however, are mooted by my ruling that the seizure happened after Roman saw Wiggan's firearm.

-21-

standing in a parade in the Virgin Islands, was carrying a gun did not establish reasonable

suspicion because carrying a concealed weapon was not necessarily a crime and the government

did not put forward other facts establishing that the defendant's gun possession was likely illegal.

*Id.* at 217-18. Wiggan claims that his case parallels *Ubiles* because in Connecticut it is also not

necessarily a crime to carry a concealed weapon.  *See* Conn. Gen. Stat. § 29-28 (establishing

permit system for individuals to carry concealed weapons).

The government disagrees with that conclusion, and argues that *Ubiles* has been

distinguished by several unpublished Second Circuit cases.  *See United States v. Lucas*, 68 Fed.

Appx. 265, at *2 (2d Cir. July 10, 2003) (unpublished opinion) (holding that seizure of defendant

observed carrying a weapon, and who fled the police after being summoned, was supported by

reasonable suspicion); *United States v. Manuel*, 64 Fed. Appx. 823, at *3 (2d Cir. May 15, 2003)

(unpublished opinion) (holding that stop-and-frisk of defendant was supported by reasonable

suspicion because the officer received a tip, saw what appeared to be a concealed gun on the

defendant's person, and the defendant was standing "shortly after midnight in a high-crime

area").  What is consistent in those cases, and distinguishable from *Ubiles*, is the presence of

other articulable facts that, in combination with their observation of the weapon, would permit

the officers to reasonably suspect that the gun was possessed illegally.  Such facts are present

here: the officers saw the gun in Wiggan's pants pocket, which, based on their experience, was

an unusual way for a lawful gun possessor to carry a firearm, and Wiggan reacted visibly and

nervously to the officers' entrance into the store.[9]  Furthermore, Connecticut law dictates that

_____

[9] The government also claims that reasonable suspicion was supported by the fact that
Wiggan was stopped in a high crime area, which is one factor for the court to consider in
analyzing whether a seizure was reasonable.  *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000).

-22-

possession of a concealed weapon is illegal unless a person has acquired a permit; in other words, it was fair for the officers to presume that Wiggan's gun possession was unlawful, especially when coupled with the suspicious way he carried it and comported himself.  *Cf. United States v. Bold*, 19 F.3d 99, 104 (2d Cir. 1994) (concluding that, because "the overwhelming majority of the people in New York State and City are not licensed to carry handguns," officers had reasonable suspicion to believe that the defendant did not possess his weapon legally).  Police officers who observe a person carrying a concealed weapon are permitted to conduct a limited stop, rather than risk harm to themselves and to bystanders, while they determine whether possession of the weapon is lawful.

The totality of those facts establishes that the officers had reasonable suspicion to perform a *Terry* stop when they handcuffed Wiggan.[10]  The officers saw the weapon and had a sufficient

---

Although I do not question the testimony of Roman and Zona that Fair Haven suffers from a high crime rate, I find it, at best, weakly supportive of the officers' reasonable suspicion.  Factually, there was no indication that any crime was occurring that morning; by all accounts, the neighborhood was quiet.  In addition, I share the reservations expressed by Chief Judge Thompson in *Ramos*: "[I]f the mere fact that a chain of events occurred in a high crime area is a material consideration, the logical result is that residents (law-abiding and not) of such areas are afforded less in the way of protection from unreasonable seizures by law enforcement authorities than their peers who are fortunate enough to live in neighborhoods with better reputations."  71 F. Supp. 2d 40, 46 n.4.  I therefore recognize this potential factor in deciding Wiggan's motion to suppress, but find it immaterial to determining whether reasonable suspicion existed to justify the seizure in this case.

[10] Even if I am wrong, and Wiggan had actually been arrested when he was handcuffed, the officers likely had probable cause.  (The government did not argue this point but relied entirely on its reasonable suspicion analysis.)  Probable cause to arrest "exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested."  *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983).  In this case, the officers arguably had probable cause based on the information that the arresting officers learned from the anonymous tip and their observation of the handgun on his person.  An apposite case is *United States v. Redick*, No. 3:05cr168 (MRK),

basis to believe that it was being carried unlawfully.  That justified Wiggan's seizure – including the use of handcuffs – and the limited search outside of Moe Love's barbershop.

## III.    Conclusion

Hopeton Wiggan was seized once Officers Roman and Quintero handcuffed him.  That seizure constituted a temporary investigative stop-and-frisk, which lasted until the officers removed Wiggan from Moe Love's barbershop, patted him down, and removed his gun, at which point Wiggan's seizure became a full arrest.  The stop-and-frisk was supported by reasonable suspicion, based on the anonymous phone call, Wiggan's behavior once the officers entered the barbershop, and, most importantly, the protrusion of Wiggan's firearm from his pants pocket.

For those reasons, Wiggan's motion to suppress evidence on the basis of the Fourth Amendment (doc. # 19) is DENIED.  I deny without prejudice Wiggan's motion to suppress the statements he made to Officers Roman and Quintero, as neither side presented evidence on the matter.

It is so ordered.

Dated at Bridgeport, Connecticut, this 8th day of July 2010.

/s/
_____
Stefan R. Underhill
United States District Judge

_____

2006 WL 908153 (D. Conn. Apr. 5, 2006), where the district court held that police officers had probable cause to arrest after receiving information that the defendant possessed a gun illegally and, in the course of performing the initial stop, observed that he actually was carrying a weapon. *Id.* at *2 (citing *Adams v. Williams*, 407 U.S. 143, 148 (1972)).  In *Redick*, the officers had probable cause even though the informant said nothing about the lawfulness of the gun's possession; their sighting of the weapon was sufficient to establish probable cause to support the arrest.  The same outcome is warranted here, as well.

-24-